UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS VARGAS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 11012 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In November 2015, Louis Vargas suddenly felt sick during a dinner banquet. So he went home and went to bed. The next morning, his wife, Minnie Vargas, found him unresponsive. R. 1, Compl.[1] It turns out that, unfortunately, Vargas had suffered a heart attack and experienced septic shock from a urinary infection. He was hospitalized for ten days. *Id*. Around a month later, he was diagnosed with carpal tunnel syndrome. *Id*. Eventually, Vargas filed this lawsuit under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), alleging medical malpractice arising from an October 2015 visit to the Urology Clinic of the Department of Veterans Affairs (known by the acronym VA) Edward Hines, Jr. Hospital. Specifically, Vargas alleges that Hines Hospital's health care providers breached the standard of care after failing to follow up with a urinalysis obtained in October 2015, and that that breach proximately caused his carpal tunnel syndrome.

---

[1]This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1346(b) and 2671 *et seq*. Citations to the record are "R." followed by the docket entry number and, where applicable, a page or paragraph number.

In February 2019, the case proceeded to a five-day bench trial, during which both fact and expert witnesses testified. The parties delivered closing arguments focused on liability (as distinct from damages), and then filed post-trial briefs. R. 105, Pl.'s Br.; R. 114, Gov.'s Resp. Br.; R. 116, Pl.'s Reply Br. This Opinion sets forth the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a). These findings are based on the records allowed into evidence and the testimony at trial. The findings are also premised on the Court's credibility determinations after observing each of the witnesses testify in-person at trial. As detailed below, the Court finds that Vargas has not met his burden of proof on liability and enters judgment in favor of the United States.

## I. Background

The following evidence was offered at trial and is undisputed except where noted. To the extent that any factual findings are made in the Conclusions of Law section, that was done to better organize the Opinion for comprehensibility.

### A. Medical History

Vargas is now a 73-year-old Vietnam veteran. 2/6/19 L. Vargas Trial Tr. at 24:22-23; 25:9-20. He suffers from several disabilities and chronic illnesses, including diabetes with peripheral neuropathy, hypertension, obesity, post-traumatic stress disorder, arthritis, chronic low back pain, and benign prostatic hypertrophy (often referred to as "BPH"). *Id*. at 101:9-104:7; Joint Exh. 1, VA Medical Records at 1515.[2] Many of these illnesses, specifically, diabetes, diabetic neuropathy, age, obesity, and

---

[2]The page numbers noted with respect to the parties' joint exhibits refer to the Bates number stamped on the bottom right hand corner of the document.

arthritis are associated with carpal tunnel syndrome. *See* Fernandez Trial Tr. at 95:22-25; Hoepfner Trial Tr. at 22:20-23:25. Additionally, BPH and diabetes are risk factors that predispose individuals to contracting urinary infections. *See* Coogan Trial Tr. (afternoon) at 32:9-21; Fox Trial Tr. at 40:8-14.

Vargas had been receiving medical care for his disabilities and illnesses from the Hines VA Hospital system since around 1985. 2/6/19 L. Vargas Trial Tr. at 101:6-8. Starting in around 2014, Mary Petrella, a nurse practitioner at the Hines Hospital Joliet Community-Based Outreach Clinic, became Vargas's primary care provider. Petrella Trial Tr. at 7:10-22. Vargas regularly met with Petrella—every three months or so—for routine follow-ups on his chronic medical issues. *See id*. at 8:1-4. In addition to receiving treatment from the VA, Vargas also saw outside providers, including a private urologist who treated Vargas for urinary tract infections in 2015. *Id*. at 17:15-19:7; 2/6/919 L. Vargas Trial Tr. at 112:25-113:6.

## B. Back Surgeries and Follow-up Visits

In early March 2015, Petrella referred Vargas to a physiatrist for right-shoulder pain. Petrella Trial Tr. at 23:10-24:2. At the referral, Vargas saw Dr. Chandhuri and complained to her about ongoing right-shoulder pain, as well as numbness or tingling in his arm if he kept his arm flexed at the elbow. VA Medical Records at 1552. These symptoms are a sign of ulnar-nerve conditions. Hoepfner Trial Tr. at 10:22-12:14; Fernandez Trial Tr. at 89:23-90:7. He also complained that he felt weakness in his right hand, and that this condition had been worsening over the past two years. VA Medical Records at 1552.

3

Later that month, Vargas underwent two back surgeries in late March and early April 2015 with an outside provider—Silver Cross Hospital—to treat his chronic lower back pain. 2/6/19 L. Vargas Trial Tr. at 32:6-16, 104: 8-11. Vargas initially went in for a lumbar fusion, and while the doctors were performing that procedure, they found a fracture in a different part of his spine. *Id.* at 104:14-19. So the doctors performed two surgeries. *Id.* Vargas was then hospitalized for an additional 30 days due to complications related to colitis. *Id.* at 32:20-33:8, 104:20-22.

Following the two surgeries, Vargas saw Petrella for one of his routine follow-ups on June 9, 2015. VA Medical Records at 1531. In advance preparation for the June visit, Petrella ordered Vargas to have a urinalysis conducted on May 20, 2015. Petrella Trial Tr. at 29:24-30:5. A urinalysis allows medical-care providers to analyze the contents of the urine and make a preliminary diagnosis. *See* Buesser Trial Tr. at 42:3-7; *see also* Turner Trial Tr. at 14:10-17. The lab results from the May urinalysis tested positive for nitrites and had high white-blood cell and leukocyte-esterase counts. *See* VA Medical Records at 1606; *see also* Petrella Trial Tr. at 36:24-38:5; Fox Trial Tr. at 29:12-31:2; Coogan Trial Tr. (afternoon) at 15:3-16:12. These results could indicate the possibility of a urinary tract infection (which the parties and witnesses referred to with the shorthand "UTI"). Coogan Trial Tr. (afternoon) at 15:22-16:4; Fox Trial Tr. at 47:14-49:1; Petrella Trial Tr. at 37:1-3 ("[P]ositive nitrites … is an indication that there *could* be an issue with a … urinary infection … *or* contaminant.") (emphases added). Also, Vargas's recent back-surgery hospitalization

likely involved the use of a Foley catheter, which could also make a patient predisposed to a UTI. Petrella Trial Tr. at 33:14-25.

A UTI is a "symptomatic infection of the urinary tract." Buesser Trial Tr. at 41:3-4. Common symptoms of a urinary tract infection include dysuria (painful or difficult urination), frequent urination, incontinence, and abdominal or lower pelvic pain. *Id*. at 41:9-25. But at the June 9 visit, Petrella noted that Vargas had no "signs or symptoms" of a UTI. Petrella Trial Tr. at 34:9-15; VA Medical Records at 1537. She also noted that Vargas had already been treated with antibiotics during his hospitalization. VA Medical Records at 1537. Either way, to be safe, on June 9, Petrella ordered a follow-up urinalysis and a urine culture based on the results of the May urinalysis and Vargas's predisposition to UTIs based on the recent hospitalization. Petrella Trial Tr. at 36:10-13; *see also* VA Medical Records at 1537-38. Medical-care providers use urine cultures to confirm whether there is the presence of an infection in the urine. *See* Buesser Trial Tr. at 42:8-9.

The results of the June urinalysis were similar to the results of the one done in May. *Compare* VA Medical Records at 1606 (May urinalysis results) *with* 1604 (June urinalysis results). Vargas's urine again tested positive for nitrites and had high white-blood cell and leukocyte-esterase counts. *See* VA Medical Records at 1604; *see also* Petrella 38:9-15; Fox Trial Tr. at 31:7-16. Also, the culture showed the presence of 100,000 colony-forming units per milliliter of E. coli. *See* VA Medical Records at 1605. So even though Vargas did not have signs or symptoms of a UTI, based on the lab results of the urinalysis and the culture, and Vargas's medical

history, Petrella diagnosed Vargas with a UTI and prescribed him antibiotics. Petrella Trial Tr. at 40:1-7.

## C. The Urology Clinic Visit

Fast forward to September 2015: Vargas again visited Petrella, this time with complaints about his erectile dysfunction medication. VA Medical Records at 1514-15. During this visit, Petrella noted that Vargas was not experiencing a change in urinary symptoms and that he was taking Oxybutynin and Terazosin to treat his lower urinary tract symptoms associated with BPH. VA Medical Records at 1515. She also listed BPH under Vargas's "problem list." *Id*. After this visit, Petrella referred Vargas to the Hines VA urology clinic. *Id*. at 1453.

About a month later, on October 2, 2015, Vargas went to the Hines VA urology clinic and was examined by nurse practitioner Julia Buesser. *See* VA Medical Records at 1454. During the visit, Buesser took notes on the reason for Vargas's visit; his medical history, including his two recent back surgeries; and his current symptoms. *Id*. Buesser specifically noted that Vargas had the following symptoms: significant hesitancy and intermittent voiding pattern, nocturia (excessive urination at night), urgency without incontinence, significant post-void dribbling, and difficulty voiding from a seated position. *See id*.

In addition to the information that she gathered from Vargas directly, Buesser also looked up and noted Vargas's past visits to the VA urology department. VA Medical Records at 1456. She also noted that Vargas underwent a cystoscopy (a procedure that uses a camera to look inside a patient's urethra) and a microwave

prostate procedure (a minimally invasive procedure that uses thermal energy to shrink the prostate gland) at an outside private facility in 2007 to treat his lower urinary tract symptoms. *Id*. at 1456; Bresler Trial Tr. at 12:16-24. One potential risk of a microwave procedure is the formation of scar tissue in the urethra—also called a "stricture"—that can contribute to urinary symptoms. Buesser Trial Tr. at 22:13-18.

The symptoms noted by Buesser can be associated with both a UTI and BPH. Buesser Trial Tr. at 78:12-19. One way to distinguish between the two conditions is by assessing when the symptoms started and how long they last. If the symptoms are new, then they are a sign of a UTI. *Id*. If the symptoms are ongoing, meaning the patient has been experiencing them for some time, then they are a sign of BPH with LUTS (lower urinary tract symptoms). *Id*. Based on Vargas's medical records and her conversations with him, Buesser determined that Vargas's symptoms were ongoing and a sign of his "longstanding, lower urinary tract symptoms." *See* Buesser Trial Tr. at 24:18-19; 24:11-25:25 ("If I had seen that his urinary symptoms were different than before, I would have taken note of that. … I looked at [Vargas] as someone who had been dealing with lower urinary tract symptoms since 2007."). Also, Vargas denied having certain symptoms that are commonly associated with a UTI, specifically, dysuria, gross hematuria (blood in the urine), flank pain, and fever and chills. VA Medical Records at 1454; Buesser Trial Tr. at 78:20-22.

As part of Vargas's treatment plan, Buesser ordered Vargas to undergo another cystoscopy to rule out the possibility of a stricture. VA Medical Records at 1459-60. Buesser also switched Vargas from Terazosin to Tamsulosin, and decreased

his Oxybutynin dosage to treat his BPH with LUTS. *See id*. at 1459-60.[3] Buesser replaced Vargas's Terazosin prescription with Tamsulosin because Tamsulosin is a newer version of the same drug and she was hopeful that it might be more effective. Buesser Trial Tr. at 77:20-78:6. And she decreased Vargas's Oxybutynin dosage to address his hesitancy issues. VA Medical Records at 1506. Finally, Buesser ordered a urinalysis because Vargas had a history of microhematuria (microscopic levels of blood in his urine), *id*.; Vargas had not visited the VA urology department in around four years, and microhematuria is potentially indicative of genitourinary malignancy, Buesser Trial Tr. 10:9-13. Buesser consulted with Dr. Larissa Bresler, the attending urologist on duty at that time, about Buesser's proposed assessment and plan. Buesser 45:25-46:20; VA Medical Records at 1460. Bresler agreed with Buesser's assessment that the symptoms described by Vargas were symptoms of his preexisting BPH with LUTS, and signed off on the treatment plan. Bresler Trial Tr. at 8-9.

As it turns out, Vargas's October 2015 urinalysis results were similar to his June 2015 urinalysis results (which, as a reminder, were similar to his May urinalysis results) in that they again tested positive for nitrites and had high white-blood cell and leukocyte-esterase counts. *Compare* VA Medical Records at 1430 (October results) *with* 1604 (June results). April Turner, a nurse practitioner at the VA urology clinic, was responsible for reviewing routine lab work and ordering follow up if

---

[3]The parties dispute whether Buesser's BPH notation in Vargas's medical records is evidence that she "diagnosed" him with BPH, and whether this suggests that Vargas was experiencing a change in symptoms; or whether Vargas's BPH was a longstanding issue. *See* Pl.'s Br. at 14; Gov.'s Resp. Br. at 4-6; Pl.'s Reply Br. at 2-3. As discussed in further detail below, the evidence shows that Vargas had already been diagnosed with BPH and that this notation is not evidence of a new symptom.

necessary. *See* Buesser Trial Tr. at 17:17-24; Turner Trial Tr. at 10-11. But the week that Vargas's lab results came in, Turner was on vacation, and she could not remember whether Vargas's lab results were flagged for her to review or whether she actually reviewed them. Turner Trial Tr. at 9:9-10:25.

### D. History of Benign Prostate Hypertrophy

As mentioned earlier, a central question in this case is whether the symptoms that Vargas was experiencing on October 2 were signs of a UTI or ongoing symptoms of BPH. The importance of the answer will become clear later on. As explained next, the Court finds that Vargas was experiencing symptoms associated with BPH *before* his October 2 visit to the urology clinic.

BPH is the medical term for an enlarged prostate. Coogan Trial Tr. (morning) at 7:24; Bresler Trial Tr. at 8:17. Dr. Coogan, the government's retained urology expert, explained that BPH is typically diagnosed in three ways: (1) sticking a needle into the prostate to see if the tissue is enlarged; (2) using a CAT scan to show enlargement of the prostate; or (3) assessing the patient's symptoms. Coogan Trial Tr. (morning) at 7:25-8:8. A diagnosis via the third method is sometimes referred to as lower urinary tract symptoms, or LUTS. *Id*. at 9:2-12. The symptoms most commonly associated with BPH include nocturia, slow flow, hesitancy, urgency, frequency, incomplete emptying, and starting and stopping of the stream. *Id*. at 8:9-13; Bresler Trial Tr. at 8:19-20.

Vargas's medical records show that he has had BPH since at least 2004, and BPH with LUTS since at least 2007. *See* VA Medical Records at 1517, 1899. As noted

above, Vargas underwent a cystoscopy and a microwave procedure to treat his BPH symptoms in 2007. *See id.* at 1456, 1899; Bresler Trial Tr. at 12:16-24. Progress notes in Vargas's medical records specifically say that Vargas underwent this cystoscopy because he had been experiencing "irritative *lower urinary tract symptoms*" and because he had microhematuria. *See* VA Medical Records at 1899 (emphasis added). Also, back in 2007, Vargas was prescribed Oxybutynin and Terazosin to treat his BPH-related symptoms. *Id.* Oxybutynin is an anticholinergic medication that is used to relax a patient's bladder muscles, and Terazosin is an alpha-blocker that is supposed to relieve prostate pressure from the urethra. Buesser Trial Tr. at 56:5-15. Both medications are prescribed specifically to treat LUTS. *Id.*

It is true that, from 2007 through 2015, Vargas's medical records are devoid of any notation related to BPH or BPH with LUTS. It is not until Vargas's June 9, 2015 visit with Petrella that his records note again that Vargas had BPH. Petrella's notes from that visit include BPH with stress incontinence under Vargas's "problem list," and the notes say that Vargas was still on Terazosin and Oxybutynin. *See* VA Medical Records at 1531-1533. At this visit, Petrella also noted that Vargas had "no bowel or bladder changes or incontinence" because the condition was being treated with the medication. *Id.* at 1531; Petrella Trial Tr. at 55:16-18, 13:1-13. Again, at the September 1, 2015 visit, Petrella made the same notation. *See* VA Medical Records at 1515-1517. This gap, though, is not persuasive evidence (as Vargas suggests) that Buesser's BPH notation was a "new" diagnosis. Instead, this gap is explained by the fact that the VA system did not have all of Vargas's medical records, particularly

those from outside providers. *See* Buesser Trial Tr. at 23:25 ("We don't have any of these records."). Petrella explained that the VA's medical records for patients who, like Vargas, receive "dual health care"—meaning they receive health care from both the VA health system and outside providers—are "only as good as what the patient provides." Petrella Trial Tr. at 26:12-14. In other words, VA medical records will not always include information about health care received from outside providers unless the patient notifies the VA. *Id*. Ultimately, the record shows that Vargas remained on Terazosin and Oxybutynin from 2007 until October 2015, when, as explained above, Buesser switched Vargas to Tamsulosin and lowered his Oxybutynin dosage, suggesting that his BPH with LUTS had been ongoing since 2007.

### E. November 2015 Hospitalization

About a month after Vargas's urology clinic appointment, Vargas suffered a heart attack, septic shock, and acute respiratory failure and was hospitalized. Joint Exh. 3, Presence St. Joseph Records at 578-79. Vargas's hospital records show that this was probably the result of a UTI caused by E. coli or klebsiella. *See id*. at 582 ("Infection is probably caused by E.coli or klebsiella."). Vargas remained hospitalized for ten days. During those ten days, he had multiple IVs hooked up to him. *See* M. Vargas Trial Tr. at 32-34.

According to Vargas, during his hospital stay, his hands were swollen, and they hurt. *See* 2/6/19 L. Vargas Trial Tr. 50:16-19, 45:14-19; *see also* M. Vargas Trial Tr. 35:9-11, 36:3-6. Vargas testified at trial that he complained to the nurses and physicians about the swelling and pain. *See* 2/6/19 L. Vargas Trial Tr. at 46:10-17.

And according to Vargas's wife, Minnie Vargas, the nurses soaked Vargas's hands in hot water to help with the swelling, though that did not help. M. Vargas Trial Tr. at 36:18-25.

Vargas's hospitalization records tell a somewhat different story. The notes entered by physicians mostly say that Vargas did not suffer from swelling at all or, at other times, only suffered from very mild swelling. On each day that he was hospitalized, Vargas underwent a physical examination by a physician. *See* Presence St. Joseph Records at 579 (11/8/15 physician note); 582 (11/9/15 physician note); 600 (11/10/15 physician note), 606 (11/11/15 physician note), 612 (11/12/15 physician note), 617 (11/13/15 physician note), 620 (11/14/15 physician note), 626 (11/15/15 physician note), 629 (11/16/15 physician note), 632 (11/17/15 physician note). As part of these examinations, the physicians who saw Vargas would check to see whether Vargas had swelling (noted as "edema" in the hospital records) in his extremities. *Id.* On November 8, the physician who examined Vargas noted that Vargas had "no significant … edema" in his extremities. *Id.* at 579 (11/8/15 physician note). The next day, on November 9, the physician who examined Vargas noted "[n]o … edema." *Id.* at 582 (11/9/15 physician note). For every other examination, the physicians similarly noted that edema was "absent" in Vargas's extremities. *Id.* at 600 (11/10/15 physician note), 606 (11/11/15 physician note), 612 (11/12/15 physician note), 617 (11/13/15 physician note), 620 (11/14/15 physician note), 626 (11/15/15 physician note), 629 (11/16/15 physician note), 632 (11/17/15 physician note).

In some contrast, the nursing notes from Vargas's hospitalization do state that Vargas had at least *mild* swelling. During the hospital stay, nurses examined Vargas every four hours on a daily basis and took notes related to the swelling in his extremities. On November 10 and 11, the nurses noted that Vargas had "bilateral" "upper extremity" edema each time that they assessed him. *See* Presence St. Joseph Records at 169, 176-77, 183, 197, 201, 204, 213, 216-17, 220-21, 226-27, 235-36. At 6:30 p.m. on November 11, one of the nurses noted bilateral *hand* edema. *Id*. at 237-38. From then on, the nurses continued to note bilateral hand edema until Vargas was discharged on November 17. *Id*. at 252-53, 267-68, 274-75, 289-90, 298-99, 312-13,319-20, 327-28, 339-40, 347-48, 353-54. But Vargas's swelling was never rated as higher than a 1 on a 5-point scale, with zero representing no swelling at all. *Id*.; *see also* Fernandez Trial Tr. at 60:7-11. And that means that Vargas's swelling, when present, was never worse than *mild*. Fernandez Trial Tr. at 60:17-18. According to the hospitalization records, Vargas complained to the nurses just once about numbness in his hands. Presence St. Joseph Records at 298.

### F. Carpal Tunnel Syndrome

Vargas was discharged from the hospital on November 17, 2015. Before the hospitalization, Vargas had been very active with his hands and generally had no problems with his hands. Presence St. Joseph Hospital Records at 822. About two weeks after his hospitalization, though, Vargas complained to health care providers that he was experiencing bilateral hand pain and that his fingers were "locked up." Joint Exh. 5, Neuroscience Institute Records at 1292. Vargas was referred to Dr.

Marquess Wilson at the Neuroscience Institute at Presence St. Joseph Hospital. Presence St. Joseph Records at 822. Vargas complained that after his heart attack, he was experiencing pain in his fingers and that he had difficulty flexing them. *Id.* Vargas also complained about pain and swelling in his hands. *Id.* At this consultation, Wilson noted that "the main consideration" based on Vargas's symptoms was carpal tunnel syndrome. *Id.* at 823. In response to Vargas's complaints, Wilson ordered x-rays, an EMG and nerves-conduction studies, and a pain-management consultation. *Id.* at 823.

The results of the EMG and nerves-conduction studies showed the presence of severe carpal tunnel syndrome on both of Vargas's hands. Presence St. Joseph Records at 833. Vargas wanted a second opinion, so he made an appointment with Dr. Keith Schmidt and met with him in February 2016. Joint Exh. 8, Schmidt Records at 1346. At his consultation with Schmidt, Vargas told Schmidt that his hand pain started on November 8, 2015 (the day after his heart attack) after having multiple IV sticks in his hands and experiencing severe edema. *Id.* Vargas described his pain as a seven on a ten-point scale. *Id.* Schmidt confirmed Wilson's diagnosis of carpal tunnel syndrome and referred Vargas to a neurologist for carpal tunnel release surgery. *See id.* at 1349. Around one month later, Schmidt administered cortisone shots to Vargas's shoulder and noted that he would administer shots for Vargas's carpal tunnel syndrome at the next visit. *Id.* at 1350.

Eventually, Vargas underwent carpal-tunnel release surgeries in April and May 2016. Joint Exh. 14C, Parkview Orthopaedic Medical Bill at 2442. After the

surgeries, Vargas received physical therapy once a week at Parkview Orthopaedic for a couple of months. *See* 2/6/19 L. Vargas Trial Tr. at 58:5-8. During this time, Vargas's condition improved. Just one month after his surgery, Vargas's pain, while still significant, did not interrupt his sleep, and the numbness and tingling in his hands were slowly going away. *See* Joint Exh. 4, Parkview Orthopaedic Medical Records at 1247. Then during a therapy session in August, Vargas noted that he was able to cut his own food. *Id.* at 2272. Two weeks later, Vargas hit a milestone: he was able to close both of his fists during therapy. *Id.* at 2281. Vargas ended physical therapy with Parkview Orthopaedic in September 2016, and on his last day, his doctor noted that Vargas was doing better and that his motion and function were returning. *Id.* at 2288.

After his last physical-therapy session with Parkview Orthopaedic, Vargas continued to receive physical therapy at the VA. *See* VA Medical Records at 1856. During his initial visit with the VA, Vargas underwent an assessment of his ability to perform daily functions, otherwise known as "activities of daily living." *Id.* at 1858. These activities include feeding, grooming, bathing, dressing, toileting and homemaking. *Id.* For each of these, the VA assessed a score ranging from one to seven, with seven representing that Vargas could perform the activity independently; six meant that he could perform the activity independently with some modifications; five represented that he could perform the activity under supervision; and so on. *Id.*; *see also* 2/6/19 L. Vargas Trial Tr. at 120:3-16. At his initial visit, Vargas was able to perform all of the activities of daily living either with supervision (a score of five on

the scale) except for feeding, which he was able to do independently with some modification (a score of six on the scale). VA Medical Records at 1858.

On October 7, 2016, Vargas had his last physical-therapy session with the VA. By that time, the pain in his hands and wrists was a one out of ten and he had met most of the goals of his therapy. *See* VA Medical Records at 2031-2033. Vargas was able to grasp the phone with his left hand pain-free, open a container using both hands pain-free, perform all exercises independently, and dial a phone with his left hand. *Id*. at 2033. The only goal Vargas was unable to meet was to cook independently without pain. *Id*.

Just a couple of weeks later, Vargas was still experiencing pain and a limited range of motion. *See* Joint Exh. 9, Bolton Medical records at 2300. Four months later, in February 2017, Vargas was experiencing tenderness in his wrists and weakness in his hands. *Id*. at 2326. Vargas's condition got progressively worse and in May 2017, Vargas started occupational therapy at Midwest Hand Care. Joint Exh. 10, Midwest Hand Care Records at 2355. During his initial visit with Midwest Hand Care, he rated his pain as an eight out of ten. *Id*. Vargas also complained that he was unable to bend his fingers into a fist and that he had difficulty opening containers. *Id*. By August 2017, Vargas's condition had improved but he reached a plateau and discontinued therapy. Joint Exh. 11, Keane Medical Records at 2420.

## II. Legal Standard

Vargas seeks relief under the Federal Tort Claims Act, 28 U.S.C. § 2674, for the VA's alleged negligence in failing to follow up on his October 2 urinalysis. The

Federal Tort Claims Act "is a limited waiver of the United States' sovereign immunity." *Luna v. United States*, 454 F.3d 631, 634 (7th Cir. 2006). It renders the federal government liable for those acts or omissions of its employees that would be unintentional torts in the state in which they occurred had they been committed by someone other than a federal employee. *Id.*; *Richards v. United States*, 369 U.S. 1, 6 (1962); s*ee also Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013) ("In the FTCA, … Congress waived the United States's sovereign immunity for suits brought by persons injured by the negligence of federal employees acting within the scope of their employment."). An action brought under the Federal Tort Claims Act is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Luna*, 454 F.3d at 634. In this case, the alleged medical malpractice occurred in Illinois, so Illinois law governs.

Under Illinois law, the patient must establish the following elements to prevail in a medical malpractice action: "(1) the standard of care in the medical community by which the [medical provider's] treatment was measured; (2) that the [medical provider] deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes*, 739 N.E.2d 496, 502 (2000); se*e also Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (applying Illinois law). Very generally speaking, a "plaintiff must present expert testimony to establish all three elements." *Wilbourn v. Cavalenes*, 923 N.E.2d 937, 949 (2010). The elements must each be proven by a preponderance of the evidence, "otherwise referred to as the 'more probably true than not true' standard."

*Holton v. Mem'l Hosp.*, 679 N.E.2d 1202, 1207 (1997) (citing *Borowski v. Von Solbrig*, 328 N.E.2d 301, 305 (1975)).

## III. Analysis

Vargas does not set forth a definitive baseline standard of care but suggests that the standard of care here required some follow-up to his October 2 urinalysis, namely, a urine culture and possibly additional treatment. *See* Pl.'s Br. at 11. According to Vargas, if the VA had ordered a culture, then he would have been diagnosed with a UTI and he would have been prescribed the appropriate treatment. *Id.* at 12. This alleged breach, argues Vargas, caused him to suffer a heart attack. *Id.* The hospital stay in turn allegedly caused severe swelling in his hands, which then caused the carpal tunnel syndrome. *Id.* at 18-22. In response, the government argues that additional follow up was not reasonably necessary because Vargas did not have symptoms of an infection. Gov.'s Resp. Br. at 1. And even if a breach did occur, the government argues that any alleged negligence did not cause Vargas's carpal tunnel syndrome. *Id.* The Court agrees that Vargas has failed to prove that Hines Hospital health care providers were negligent.

### A. Standard of Care

In determining the appropriate care that must be provided to a patient, Illinois law "requires [medical providers] to possess and apply the knowledge, skill, and care which a reasonably well-qualified [medical provider] in the same or similar community would bring to a similar case." *Wilbourn v. Cavalenes*, 923 N.E.2d 937, 953 (2010) (cleaned up); *see also Neade*, 739 N.E.2d at 502. A breach occurs when a

medical provider fails to use the "reasonable skill" that a medical provider in good practice would ordinarily use and would bring to a similar case. *Cummings v. Jha*, 915 N.E.2d 908, 920 (2009) (quoting *Pugh v. Swiontek*, 253 N.E.2d 3, 5 (1969)).

Based on the record evidence, the Court finds that no action other than reviewing the lab results of the October 2 urinalysis was reasonably required as a follow-up. As a preliminary matter, the record does not show whether or not Turner ever actually reviewed the results of Vargas's urinalysis. But at trial, Turner explained that, even if she had reviewed the results, she would not have ordered any follow-up for two reasons: (1) the urinalysis was ordered specifically because of concerns regarding microhematuria and the urinalysis results were negative for microhematuria; and (2) there was no indication in Buesser's notes that Vargas was suffering from symptoms related to a urinary tract infection. *See* Turner Trial Tr. at 25-27. Turner further explained that the urinalysis results could be indicative of a UTI *if* the patient was also experiencing *new* lower urinary tract symptoms. *See id.* at 12:18-18:23.

Christopher Coogan, the government's retained urology expert, agreed (not surprisingly) with Turner's assessment. According to Coogan, the standard of care here only required the VA to review the urinalysis lab results. *See* Coogan Trial Tr. (morning) at 49:18-51:1. A follow-up urine culture was not necessary because Vargas did not have a symptomatic infection and the symptoms described by Vargas in October were instead signs of Vargas's ongoing BPH with LUTS. *Id.* at 30:15-31:11. Vargas's medical records support Cogan's reasoning. First, as explained earlier in

this Opinion, Vargas had a history of BPH with LUTS since at least 2007 (when he underwent a microwave procedure and cystoscopy to treat his LUTS), and the symptoms that Vargas described at his October 2 urology clinic visit were consistent with the common symptoms of BPH with LUTS. *See* VA Medical Records at 1456, 1899; *see also* Coogan Trial Tr. (morning) at 19:21-20:13 ("Someone who has LUTS, this would be a pretty standard kind of complaint. You know, it's usually fairly stable. … none of it stands out consistent with a UTI and none of it just sort of seems like it has changed, … It seems baseline."). Buesser and Bresler also both agreed that Vargas's symptoms on October 2 were consistent with BPH. What's more, back in 2007, Vargas was prescribed medication to treat his BPH-related symptoms. *See* VA Medical Records at 1899. And when Vargas saw Buesser in October 2015, he was still on those same medications.

Second, Vargas's medical records show that Vargas did not experience a change in symptoms. Buesser explained at trial that the symptoms that Vargas experienced could be associated with either a UTI or BPH. Buesser Trial Tr. at 78:12-19. She further explained that when the symptoms are new, they are a sign of a UTI. *Id*. But when they are ongoing, then they are a sign of BPH with LUTS. *Id*. Buesser also credibly testified that she would have made a note of any changes in symptoms during her consultation with Vargas. *Id*. The breadth and detail of Buesser's October 2 note corroborates her testimony. Even Vargas's retained expert in infectious diseases, Dr. Barry Fox, testified that Buesser would have asked "detailed questions regarding the bladder and the urine system." Fox. Trial Tr. at 46.

Vargas suggests that the fact that Buesser switched Vargas from Terazosin to Tamsulosin indicates that Vargas experienced a change in symptoms. Pl.'s Br. at 14. But Buesser credibly explained that she changed Vargas's prescription to Tamsulosin because it was a newer version of the same drug and she thought it might be more effective. Buesser Trial Tr. at 77:20-78:6. So the change in prescription did not mark a change in symptoms. Vargas also points out that Coogan testified that "that there was nothing in the record to suggest that the medications that [Vargas] was taking for his symptoms were not working." Pl.'s Br. at 14; *see also* Pl.'s Reply Br. at 3. The Court assumes (though Vargas does not clearly say) that Vargas is attempting to suggest that because the medications were working, Vargas should not have had any symptoms, and any new symptoms can be attributed to a UTI. But even Vargas admits that the medications were "for the purpose of *alleviating* the symptoms," Pl.'s Reply Br. at 3, not curing the BPH with LUTS altogether. Ultimately, Vargas has not met his burden of showing by a preponderance of the evidence that the VA should have diagnosed him with a UTI instead of concluding that he has ongoing BPH with LUTS.

In arguing that the VA should have done more to figure out the UTI, Vargas also relies on his clinical history, including his risk factors, past lab results, prior UTI diagnosis, and prior treatments. *See* Pl.'s Br. at 11. In support of this standard of care, Vargas relies on his retained experts, Dr. Barry Fox and Nurse Practitioner Donna Woodward, who both opined that based on Vargas's October 2 urinalysis result *and* his clinical history, a urine culture should have been ordered. Specifically, Fox

opined that a culture should have been done "to add one more piece of data to the total assessment … to see whether further investigation or treatment was necessary." Fox Trial Tr. at 50:7-22. Woodward likewise opined that a urine culture following the October 2015 urinalysis results was required to identify any bacterial growth and determine what, if any, antibiotics are appropriate. In other words, Fox's and Woodward's testimonies directly contradict Coogan's. In the case of dueling experts, the Court "must determine what weight and credibility to give the testimony of each expert and physician." *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (citing cases).

Here, the scale tips slightly in favor of Coogan's testimony, which is enough to undermine Vargas's case because he bears the burden of proof. Coogan is a urologist and has experience screening, diagnosing, and treating individuals with UTIs, BPH, and asymptomatic bacteriuria. *See* Coogan Trial Tr. at 5:21-6:9. Neither Fox nor Woodward, however, are experts in urology. Although Fox works closely *with* urologists, he himself is not a urologist. Fox Trial Tr. at 9:3-21. He is an infectious disease doctor and deals with *any* type of germ that might be considered an infection. *Id*. at 7:10-19. This includes strep throat, common colds, Lyme disease, and of course UTIs. *Id*. Although Fox testified that he typically gets referrals from urologists for patients with recurrent UTIs, *id*. at 9:15-21, the record is absent on his experience screening, diagnosing, and treating individuals with BPH. And because BPH is not an infectious disease, it is reasonable to infer that Fox likely has less knowledge and

expertise than Coogan on BPH and its symptoms, and how it affects screening, diagnosing, and treating UTIs and asymptomatic bacteria.

Woodward likewise lacks expertise in urology. She testified at trial that she does not have any specialized training or vocations in urology. She further testified that she has not taken courses that pertain specifically to urology, and that she does not belong to any urological associations. Instead, Woodward is a nurse practitioner and administers *general care* at a VA clinic. Moreover, Buesser and Bresler, although not retained as experts in this case, both work in the field of urology and agreed that Vargas's symptoms on October 2 were consistent with his pre-existing BPH with LUTS.

In further support of his position, Vargas also points to the fact that under very similar conditions, Petrella ordered a culture, diagnosed Vargas with a UTI, and treated him with antibiotics. Vargas argues that Petrella's actions suggest that Fox and Woodward are right—the standard of care required more follow up, including a culture. Pl.'s Br. at 11. But Petrella is likewise *not* an expert in urology. And the only urology expert in this case, Coogan, testified that while Petrella's action were within the standard of care, they were not *required* to satisfy the standard of care. Coogan explained that he did not think that back in June 2015 (when Petrella examined Vargas) Vargas had a UTI because, according to Petrella's notes, Vargas did not have a change in symptoms. *See* Coogan Trial Tr. at 29:21-1. Coogan testified that, instead, Vargas probably had asymptomatic bacteriuria, Coogan Trial Tr. (morning) at 30:1-2, which would explain the lab results and lack of symptoms.

Vargas also points to the testimony of April Turner (the nurse who was supposed to review Vargas's urinalysis) for support. *See* Pl.'s Br. at 11. In her deposition, Turner testified that "[she] would recommend a culture if she saw *this*" ("this" being the October 2 urinalysis results). *See* Turner Trial Tr. at 16:15-16. Vargas takes "this" to mean that Turner would have ordered a culture in *this case*. *See* Pl.'s Br. at 11. But at trial, Turner clarified that that response was based only on the documents shown to her during her deposition and that in her deposition she meant that she would order a culture if the *only* information she had was the October 2 lab results. *See* Turner Trial Tr. at 14:18-21; 20:22-25. She further testified that based on *all* of the information in this case (including Vargas's ongoing BPH with LUTS), she would *not* order a culture. *Id*.

Lastly, Vargas points out that if the culture had been done, it would have likely shown the growth of E. coli. *See* Pl.'s Br. at 17. But regardless of what the results of a culture would have been, without any new symptoms, the standard of care does not require a medical provider to prescribe antibiotics. *See* Coogan Trial Tr. (morning) at 25:11-15; 30:9-14. In fact, there are various down sides to doing so, including: (1) anti-bacterial resistance (meaning a patient can develop resistant organisms that make it more difficult to subsequently treat infections); (2) interactions with other medications; and (3) side effects. *Id*. at 25:16-26:2. Fox even agreed that generally "it would be outside the standard of care for a physician to treat a patient with asymptomatic bacteria with antibiotics." Fox Trial Tr. at 61:11-14.

Ultimately, Vargas has not shown by a preponderance of the evidence that the standard of care required further follow-up. So Hines Hospital health care providers did not breach the standard of care, and Vargas's claim fails.

## B. Causation

With the case failing on liability, this Opinion could end right here. But it might be useful for the parties to know (whether for settlement or other purposes) what the Court's decision would have been on causation and damages. Generally speaking, "[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch*, 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272 (2008)). To establish this element, Vargas must show "cause in fact and legal cause." *Id.* (quoting *Bergman v. Kelsey*, 873 N.E.2d 486, 500 (2007)). "Cause in fact exists when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* ((quoting *Coole v. Cent. Area Recycling*, 893 N.E.2d 303, 310 (2008)). To prove legal cause, Vargas must also show that the carpal tunnel syndrome was "foreseeable as the type of harm that a reasonable person would expect to see as a likely result of" the VA's conduct. *Id.* (quoting *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (2008)).

The gist of Vargas's causation theory is this: the VA failed to culture his October urinalysis and so they failed to diagnose and treat Vargas for a UTI, which caused Vargas to go into septic shock, which led to his ten-day hospitalization, which

led to intravenous fluids being inserted into Vargas's body, which led to swelling in Vargas's extremities, which eventually led to his carpal tunnel syndrome. *See* Pl.'s Br. at 18-22. According to Vargas, "common sense" demonstrates that his hospitalization caused him to develop carpal tunnel syndrome. But here, common sense does not satisfy the preponderance standard. *See Holton v. Mem'l Hosp.*, 679 N.E.2d at 1207.

For causation, Vargas offers the expert testimony of Peter Hoepfner, a board-certified hand and orthopedic surgeon. Hoepfner Trial Tr. at 3:6-7. For its part, the government retained John Fernandez, who also is a board-certified orthopedic surgeon, to rebut Hoepfner's opinions. Fernandez Trial Tr. at 41:18-25. Both experts have experience diagnosing and treating carpal tunnel syndrome. *See Id.* at 44:16-24; Hoepfner Trial Tr. at 5:16-6:1. And both agreed that swelling can cause the syndrome. Fernandez Trial Tr. at 54:24-55:18; Hoepfner Trial Tr. at 13:15-25. Both experts also agreed that a number of health conditions, or "comorbidities," including diabetes, diabetic neuropathy, age, obesity, and arthritis, are commonly associated with carpal tunnel syndrome. Fernandez 95:2-24; Hoepfner 22:20-23:5.

Relying on Hoepfner, Vargas argues that the IV fluids inserted into his body while he was hospitalized caused swelling in his extremities, including his hands, and consequently caused carpal tunnel syndrome. Although it is true that IV fluids can produce swelling, *see* Hoepfner 19:19-20:4, the fact of the matter is that Vargas did not suffer swelling severe enough to *cause* carpal tunnel syndrome. Before trial, Hoepfner wrote in his expert report that it is generally accepted in the medical

community that carpal tunnel syndrome can be caused by *"severe"* swelling. *See* Hoepfner Trial Tr. at 37:18-21 (emphasis added). And in his report, Hoepfner opined that Vargas's carpal tunnel syndrome was caused by just that. *Id*. at 37:15-17. Fernandez disagreed. According to Fernandez, Vargas's hospitalization records do not indicate swelling to the degree necessary to cause CTS. Fernandez Trial Tr. at 56:16-57:22. The Court agrees. Although Vargas and his wife, Minnie, testified that Vargas complained about and experienced swelling while he was in the hospital, the hospital records show that physicians noted absolutely no swelling[4] and that the nurses noted only *"mild* swelling."[5] Because the records are devoid of evidence of *severe* swelling, which Hoepfner originally opined was necessary to cause carpal tunnel syndrome, Vargas's carpal tunnel syndrome could not have been caused by the mild swelling he experienced at the hospital.

In explaining why the physicians noted no swelling, Vargas offers two unsupported hypotheses: (1) the physicians did not note any swelling because they simply copied and pasted their answers from a previous note; and (2) the physicians "simply were not concerned" with swelling in Vargas's hands because they were dealing with the more serious concern of Vargas's heart attack. Both theories are

---

[4]In his expert report, Fernandez stated that Vargas's medical records made no note of swelling at all. *See* Fernandnez at 78:1-80:4. At trial, Fernandez admitted that this was an incorrect statement based on the nursing notes. *Id*. Fernandez admits that the nursing notes charted *some* swelling (though mild) throughout Vargas's hospitalization. Fernandez 86:16-24.

[5]When confronted with the nursing notes at trial, Hoepfner changed his opinion and testified that carpal tunnel syndrome can occur with just "moderate swelling." Hoepfner Trial Tr. at 38:2-48:17. This change from the report was not persuasively explained and was not credible.

unsupported by the record. In fact, the record refutes the second theory: Hoepfner admitted during trial that severe swelling in a patient's extremities could be a symptom or sign of heart failure. Hoepfner Trial Tr. at 41:23-42:1. So the physicians would have been concerned with swelling in Vargas's extremities.

Furthermore, at trial Fernandez presented an alternative cause for Vargas's carpal tunnel syndrome: pre-existing chronic illnesses. As noted above, both Hoepfner and Fernandez agreed that carpal tunnel syndrome is commonly associated with various comorbidities and can make a patient predisposed to the syndrome. Unfortunately, Vargas suffered from several comorbidities associated with carpal tunnel syndrome, including being in his late 60s and having diabetes; diabetic neuropathy; and arthritis. And any one of these could have predisposed him to carpal tunnel syndrome. For example, age is a predisposing factor because as a person gets older, their median (hand) nerve tends to deteriorate. Fernandez Trial Tr. at 103:13-105:1. Obesity can also contribute to carpal tunnel syndrome for two reasons: (1) it can lead to other physiological disorders like diabetes (which Vargas had) and thyroid diseases, which can lead to the syndrome; and (2) the median nerve and nerve tunnel can become compressed to the point that the nerve gets pinched. *Id.* at 105:2-106:2. Fernandez also testified that comorbidities can lead to carpal tunnel syndrome over a lengthy period of time, or it can also occur suddenly. *Id.* at 106:9-107:6. So there is at least some reason to believe that Vargas's carpal tunnel syndrome was already forecast by the comorbidities, and not caused by the hospital stay.

The progression of Vargas's carpal tunnel syndrome and the symptoms related to it also support Fernandez's alternative hypothesis. Both Hoepfner and Fernandez testified that it would be unusual for a patient to undergo carpal tunnel release surgery, subsequently have their condition improve after surgery, and then have it get worse. *See* Fernandez Trial Tr. 75:20-76:8; Hoepfner Trial Tr. at 54-55. But that is what happened in this case. After Vargas underwent carpal tunnel release surgery, he went to multiple sessions of physical therapy and his condition improved. Months later, though, his condition got progressively worse. Fernandez opined that this is further evidence that an ongoing diseases and not the hospitalization episode is causing Vargas's carpal tunnel syndrome. Fernandez Trial Tr. at 75-76.

In light of all this evidence, Vargas failed to show by a preponderance that his hospitalization was the cause of his carpal tunnel syndrome.

## IV. Conclusion

Although what happened to Vargas is no doubt unfortunate, and he is still suffering, based on the evidence presented, the Court finds that Vargas has failed to show by a preponderance of the evidence that the VA committed medical malpractice. Accordingly, the Court enters judgment in favor of the government. The status hearing of January 9, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 30, 2019