**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Louis Vargas, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 cv 11012 |
| | ) | |
| v. | ) | |
| | ) | Judge Chang |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A NEW TRIAL**

## I.  INTRODUCTION

Defendant's response does not address the issue of whether Plaintiff's motion *in limine* regarding Coogan was, in fact, a *Daubert* motion and other procedural issues, nor does it address the fact that the line of cases supporting the proposition that a medical doctor can testify to a nurse practitioner in the context of this case is not good law.

Moreover, as shown below, Coogan essentially concedes that there is a different standard of care for nurse practitioners. He did this when he tried the explain the differences in his opinion that there was no need to treat Vargas, as contrasted with the actual treatment done by nurse practitioner Petrella who cultured and treated Vargas for a UTI in June 2015 under circumstances nearly identical to that encountered later that year in October.  When pressed on the difference between his opinion and Petrella's care, he stated that "people have different opinions"; that is, in effect, that an experienced nurse practitioner has a different standard of care than the doctor.  This demonstrates that not only should Coogan not have been permitted to testify to a nurse practitioners standard of care, but also, that, respectfully, the Court committed an error by not taking this into account in its opinion after it said it would do so in a previous order.

1

Similarly, the Defendant has not defended Plaintiff's argument that Fernandez did not have an adequate foundation to testify to nurses' charting of Plaintiff's "pitting" and swelling. Thus, his testimony on these subjects should not have been admitted. When this is coupled with him testifying that co-morbidities *caused* Plaintiff's carpel tunnel syndrome despite a motion *in limine* order indicating that testifying to an "*association" is different from testifying to "causation,"* it becomes clear that there was no basis to conclude that Plaintiff's CTS did not occur as Plaintiff claimed – in the hospital from the swelling he endured. As a result of the foregoing and that stated below, Plaintiff's motion should be granted.

## A. PLAINTIFF'S MOTION REGARDING COOGAN TESTIFYING TO A NURSE PRACTITIONER STANDARD OF CARE WAS NOT LATE AND SHOULD HAVE BEEN GRANTED

The Defendant contends that Plaintiff's motion to disqualify Dr. Coogan is late and thus the arguments are waived. It is not late, and the arguments are not waived.

The Defendant has not been blind-sided by Plaintiff's several motions related to the adequacy of its experts as they seemingly continuously contend. In this case, the parties originally disclosed their experts on February 9, 2018. *See* dkt. 39. This was nearly a year before trial. Plaintiff disclosed a nurse practitioner, an infectious disease specialist, and an orthopedist. Defendant only disclosed a urologist. Notably, *no urologist ever saw or treated Plaintiff during the events in question*. Plaintiff had been examined, had orders for tests (for example, urinalyses), and was a victim to a failure to follow up on an abnormal urinalysis – all at the hands of nurse practitioners. Vargas consequently suffered an infectious disease (sepsis), all of which was a consequence of an overlooked abnormal urinalyses that went untreated, he had a resulting heart attack, and then had an orthopedic problem brought on by carpel tunnel syndrome.

The parties were to disclose rebuttal experts by March 12, 2018. On March 12, 2018, Defendant filed a motion to extend the time to disclose a rebuttal orthopedic expert even though Defendant actually

2

had notice that Plaintiff would call an orthopedist months earlier, the previous December, since

Plaintiff's settlement demand letter indicated that he would be calling an orthopedist. Nevertheless,

Defendant still did not timely disclose a nurse practitioner or seek a similar extension despite knowing

that Plaintiff had disclosed one. The Court granted Defendant's motion to permit Defendant to disclose

their orthopedist expert after the deadline. Meanwhile, Defendant took Plaintiff's experts' depositions,

including nurse practitioner Woodward. After the deposition, Defendant still did not decide that he

should seek leave to obtain a nurse practitioner.

Prior to trial, Plaintiff made a *Daubert* motion and several non-*Daubert* related motions that

concerned the testimony of his experts. These motions were made within the time periods set by the

Court. Plaintiff timely made one *Daubert* related motion and appropriately it was a motion based upon

the junk science (see below, for the definition of a *Daubert* motion and junk science) that related to Dr.

Fernandez's opinion that Plaintiff's Carpel Tunnel Syndrome was caused by co-morbidities. Dkt. 59.

Plaintiff made other non-*Daubert* related motions regarding Dr. Coogan, contending that his "opinion"

was based upon his personal beliefs and regarding his testimony that there was no standard of care

regarding the need to send a urine sample to be cultured under the circumstances of this case. Plaintiff

argued that a "standard of care" is at the core of a medical malpractice case and that an expert does not

meet the requirements of an expert in this context by claiming there is no standard of care. *See e.g.*,

*Rohe v. Shivde*, 203 Ill. App. 3d 181, 192–93, 560 N.E.2d 1113, 1121 (1990) (a plaintiff must establish

what is the standard of care to make a case that a duty was breached). Dkt. 66 at 4. In other words,

some "standard of care" is what the law requires to be discussed in medical malpractice cases. Plaintiff

also noted that the cases he cited were not based upon *Daubert,* but rather, the obligation to not redefine

how medical malpractice cases are analyzed, and how duty and breach are to be determined. Dkt. 66, at

3-5.

The above was intended to argue that Dr. Coogan could not testify as he was proposing to testify because the testimony was legally unsound, but for reasons unrelated to *Daubert* and junk science. At the pretrial conference, upon further research, Plaintiff also raised the issue of Dr. Coogan testifying to a standard of a care to a profession for which he was not licensed. Following the pretrial conference, in its order, this Court stated in part that this was raised after the time set for challenging expert opinions, but "Vargas may attempt to argue that a discount of Coogan's testimony is warranted." The Court continued indicating this was so "[b]ecause it is not clear there is a factual premise or a legal premise for this argument," Vargas was then invited to brief the issue by the following day to argue "that a discount of Coogan's testimony is warranted." Dkt. 73 at 1, 2. Vargas did that the following day arguing that a total discount of Coogan's testimony was warranted since he was not allowed under the law to testify to the standard of care to a Nurse Practitioner. Dkt. 74. A week later, pursuant to this Court's order, Defendant filed an opposition to this motion. Dkt. 78.

At the beginning of trial, when asked if the Court had taken a look at this issue, the Court responded:

> THE COURT: I did, and as described at the Pre-Trial Conference, the testimony is going to be allowed because the Daubert motions were due quite some time ago, you know, and then I will consider it for purposes of how persuasive or not the testimony is.
> I do think there is – if this was a jury trial, maybe I would take a pause and do some voir dire, but I don't think that is necessary in a bench trial.

Tr. Feb 4, 2019 (morning) at 3.

Contrary to its statement, in its Opinion, this Court did not "consider [legal ability of Dr. Coogan to testify to a nurse practitioner's standard of care] for purposes of how persuasive or not the testimony is." It is not contained in the Opinion at all.

In its response to the present motion, the Defendant again insists that Plaintiff's motion regarding the legal authority for Dr. Coogan to testify to a nurse practitioner standard of car was untimely and

therefore waived. Deft's Resp. at 5. Although not explicitly mentioned by Defendant, this argument undoubtedly emanates from this Court's statement, quoted above, made just prior to trial when Mr. Fox questioned whether the Court had looked at Plaintiff's motion seeking to bar Dr. Coogan because he cannot be permitted to testify to the standard of care of a nurse practitioner.

Notwithstanding that Plaintiff has argued that his motion was not a *Daubert* motion regarding Coogan's lack of *qualifications* to testify to a nurse practitioner's standard of care, the Defendant did not address that. Clearly, a motion based upon a person's *qualifications* because he was not properly licensed is different than arguing that his opinion is based on junk science.

As Plaintiff discussed in his brief on this issue (Dkt 123 at 3, 4), this was not a *Daubert* motion. *Daubert* motions address expert opinions that are alleged to be based on junk science or whether "the reasoning or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-593 (1993). *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000) ("The principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science."). Rather than trying to rebut this legal proposition, Defendant attempts to distract and merely cites to "procedural failures" all the while ignoring their own failures to disclose a nurse practitioner.

The failure of the Defendant to have a proper expert is their own failure. They were on notice that Plaintiff disclosed a nurse practitioner nearly a year before trial, and they failed to disclose one of their own. They had the opportunity to disclose a nurse practitioner as a rebuttal expert, but procedurally failed to timely notice any rebuttal expert. Even with a motion to extend the time to notice a rebuttal expert they again failed to disclose a nurse practitioner. They finally had the option to request a continued trial to obtain a nurse practitioner, after several motions by Plaintiff to disqualify Dr. Coogan's testimony and it becoming clear that he could not testify to a nurse practitioner standard of

5

care. Again, the Defendant decided not to do this in the face of clear Illinois Supreme Court case law indicating specifically that a doctor could not testify to a nurse practitioner standard of care.

In addition to the fact that Plaintiff's motion was not late, Defendant's arguments regarding waiver also fail because of the procedural course of events of this case. Case law on the issue of waiver demonstrates that this Court should have substantively considered Plaintiff's motion. The Seventh Circuit has stated that an indication that the Court would again consider an issue raised on a motion *in limine* means that the ruling is not final and is open for reconsideration; further the follow up to an invitation to reconsider an issue is not a waiver if the follow-up is made. *Favala v. Cumberland Eng'g Co., a Div. of John Brown Inc.*, 17 F.3d 987, 991 (7th Cir. 1994). Here, in response to Plaintiff's motion to preclude Dr. Coogan from testifying to a nurse practitioner's standard of care, this Court at the pretrial indicated that Plaintiff could file a brief to argue that "a discount of Coogan's testimony was warranted." Plaintiff filed such a brief and the Defendant responded. At the beginning of trial Plaintiff again brought up the issue and this Court then indicated that the testimony would be allowed but that this Court would "consider it for purposes of how persuasive or not the testimony is." Tr. 2/14/19 (morning), at 3.

Notwithstanding this ruling, as noted above, in its Opinion the Court never did consider how persuasive Coogan's testimony was in the context of him testifying to the standard of care of a nurse practitioner. This was particularly significant to the outcome of this case for at least two reasons: first, the nurse practitioner Petrella (who had extensive nurse practitioner experience) and who actually diagnosed and treated Plaintiff in June 2015 for the near identical signs and symptoms just 4 months prior to the challenged events took an entirely different course of action than Coogan testified was the standard of care. Second, when asked at trial, Coogan actually had virtually no relevant experience *ever*

working with nurse practitioners in the relevant context; and third, Coogan testified to at least two

wholly inconsistent conclusions about the facts of the case.  (See below)

## B.  COOGAN IS NOT QUALIFIED TO TESTIFY TO THE STANDARD OF CARE OF A NURSE PRACTITIONER

The Defendant has argued that there is only one standard of care and that "reliance on the rule in

*Sullivan* is misguided, illogical, and, in fact, detrimental to [Plaintiff's] own argument."[1]  Dkt. 133, at 8.

Defendant argues that the reason for the rule is to prevent a *higher* standard of care from being imposed

and that Vargas is arguing that a "more *lenient* standard of care should have been applied to the

defendant."  *Id.*   Defendant is simply wrong.  It is not a question of a *higher* standard of care; it is a

questions of a *different* standard of care.  The Illinois Supreme Court in *Sullivan* recognized this very

issue when it quoted at length from a previous Supreme Court case as follows:

> "Illinois statutes [citations] provide for the regulation of practitioners of medicine and
> surgery, physical therapy, nursing, pharmacy, dental surgery, podiatry, optometry, etc.
> This is a clear expression by the legislature of public policy to recognize and regulate
> various schools of medicine. The various acts regulating the health professions [citations]
> provide for different training, and regulate the treatment each profession may offer. * * *
> We simply are not disposed to provide for what, in effect, may result in a higher standard
> of care when the legislature, by recognizing various schools of medicine, has not done so.
> To do so would not only be unfair * * *, but it would also assume that science and
> medicine have achieved a universal standard of treatment of disease or injury. Such is not
> the case. In its wisdom, the legislature has recognized a fundamental tenet of
> contemporary life: no one person, group or school has *114 yet succeeded in abstracting
> a universal medical method from the many changing methods used in science and
> medicine." *Dolan,* 77 Ill.2d at 284, 32 Ill.Dec. 900, 396 N.E.2d 13.

*Sullivan v. Edward Hosp., supra,* 209 Ill. 2d at 113–14.

Further, the cases that Defendant cited to got it wrong; and this is not a question of advocating

for a contrary position when there might be room to do so.  The District Court case cited by Defendant,

*Williams v. Mary Diane Schwarz, P.A.,* 2018 WL 2463391, at *6 (N.D. Ill. June 1, 2018), did state that

the reason for the rule was to "prevent a higher standard of care being imposed upon the defendant" and

---

[1] Referring to *Sullivan v. Edward Hosp.* 209 Ill.2d 100, 113-14 (2004)

cited to *Wingo by Wingo v. Rockford Mem'l Hosp.,* 292 Ill. App. 3d 896, 905–06, (2d Dist. 1997).

However, not noted by Defendant was that in this context, the *Wingo* case stated that "[w]e note that no

Illinois case has directly applied *Dolan* to prevent a physician from establishing the applicable nursing

standard of care, although it is clear that in several cases doctors have testified against nurses to establish

the nursing standard of care without it being challenged…" *Wingo supra,* 292 Ill. App. 3d at 905–06.

Also not noted by Defendant is that *Wingo pre-dated Sullivan* by 6 years, and that contrary to what is

stated in *Wingo,* in *Sullivan,* the Illinois Supreme Court did do just what *Wingo* said had not been done;

that is, it prevented a physician from establishing the standard of care for a nurse practitioner based upon

the *Dolan* case.  As a result, it cannot be said that *Wingo* is consistent with the law in Illinois regarding a

*higher* standard of care.  As noted in *Dolan, Sullivan* and the 4 other cases cited by Plaintiff in his

opening brief, it is not a question of a higher standard of care being applied, *it is a question of a different*

*standard of care.*

   The Defendant also argued that since Plaintiff asked Dr. Fox whether he was familiar with the

standard of care for nurse practitioners (and, unlike Dr. Coogan, Dr. Fox was familiar) Plaintiff undercut

his own argument.  Dkt. 133, 9.  This is totally irrelevant.  Just because Dr. Fox wrongly opined on the

standard of care for nurse practitioners, because Defendants failed to object in order to protect their own

failure to disclose a nurse practitioner expert, this does not cure the legal deficiencies of Dr. Coogan's

testimony.  It is hornbook law that a party may bring out particular evidence that it sought but failed to

exclude via motion *in limine* from the other party, without the first party waiving the objection to the

particular evidence.  *Ohler v. United States*, 529 U.S. 753, 762–63, 120 S. Ct. 1851, 1856–57 (2000).

This is done at times to blunt the impact of potentially inadmissible damaging evidence.  *Id.*  Similarly,

Plaintiff here used the challenged type of evidence from his own doctor expert that he sought to exclude

from his opponent's expert so that there could not be an argument that a doctor is more authoritative than a "mere" nurse practitioner.

However, just to blunt an inference of being disingenuous, the actual legal need for Dr. Fox's testimony was primarily causation; that is, the issue that the sepsis caused the heart attack. Also, other non-nurse practitioner issues that Dr. Fox testified to included the likely true diagnosis for Vargas (Prostatitus), the fact that the infection in June caused the sepsis in November, and that Vargas had the same bug in June as he did in November when he became very ill (thus, showing that Vargas was likely infected during his June 9th visit with NP Petrella).

Further, Defendant's motion notes that Vargas takes issue with Dr. Coogan's credentials and expertise in addressing and treating UTIs. Dkt. 133, 10-11. Defendant goes on to note that the "attack on Dr. Coogan's experience and expertise is baffling" since Plaintiff did not dispute his qualifications in the motions *in limine. Id,* at 11. What Defendant does not address is that Plaintiff focused on Dr. Coogan's lack of experience of working with nurse practitioners, which remains unchallenged. Thus, his inability to know the standard of care for nurse practitioners remains unchallenged and his opinions should have been appropriately discounted by this Court. The fact that "there is no disagreement" that Dr. Coogan is a board-certified urologist…" (*id.,*) still says nothing about his *relevant* experience. As noted in the affidavit and resume of Dr. Coogan, he did most of his work on cancer issues and the legal aspects of medical malpractice – not diagnosing and treating UTIs. Finally, the fact that this Court noted, as Defendant observes, that Dr. Fox and NP Woodward are not experts in Urology and/or that the record is silent on their experience with "BPH and its symptoms, and how it affects screening, diagnosing, and treating UTIs" and asymptomatic bacteriuria, is not consistent with the record. This also ignores the fact that Dr. Coogan got it wrong when he testified that Vargas likely had "asymptomatic bacteriuria" in June of 2015. He was further wholly inconsistent when he testified that

the standard of care is that you do not culture or treat asymptomatic bacteriuria. Tr. Coogan (afternoon), 20; 14-15. But contrary to this, he also testified that it was okay for Nurse Practitioner Petrella to culture and treat Plaintiff's "asymptomatic bacteriuria" noting that he had recently been in the hospital and had a catheter, and that "People have different opinions." *Id.,* 20:9.[2] The latter statement bears further discussion.

Again, in the context of discussing NP Petrella's care of Vargas and that she treated something that Coogan testified he would not treat or culture, he testified that "*people have different opinions.*" So, this begs the question and in fact, strongly implies that nurse practitioners have "different opinions" or stated differently, *different standards of care* not taken into account by Coogan. This serves to highlight the reason for the rule set forth in *Sullivan* as well as the damage that the testimony caused.

Coogan was likely wrong when he testified that Vargas had asymptomatic bacteriuria because there is no doubt that Vargas did not have "asymptomatic bacteriuria" in November when he had sepsis and almost died from his heart attack. Dr. Coogan admitted and agreed with Dr. Fox when he testified that in November, Vargas had one of the two same bacteria strains as he had the previous June and the other strain was a close cousin of the first. *Id.,* 30:23-32:7. Thus, if Vargas was deathly ill with the same bacteria in November as he had in June (that was then treated, albeit inappropriately), it defies logic to assert that Vargas was not sick with an infection in June since that very same bacteria was causing him to be deathly sick in November.

This contradiction in Coogan's testimony was not addressed by the court nor explained by Dr. Coogan. Especially, given Nurse Petrella's actions, Dr. Coogan's statement that people have different

---

[2] Also, the fact that Vargas had recently been in the hospital was a piece of the "whole patient" that should be considered as implicitly recognized by Coogan; just like the fact that Plaintiff had had 3 consecutive abnormal urinalyses as of October when there was no follow up to his abnormal Urinalysis.

opinions raises a strong inference of a different nurse practitioner standard of care – not to mention that it proves that Petrella's care was appropriate and the Coogan's preferred care nearly killed Vargas.

Finally, the Defendant's statement that "Dr. Coogan was the *only* testifying expert who was qualified to offer an opinion regarding whether Vargas was symptomatic for a UTI or whether the symptoms he displayed on October 2, 2015, were related to his long-standing BPH and lower urinary tract symptoms" (Dkt. 133, 12) was an absurdity. According to Dr. Fox's testimony, in his experience as an infectious disease doctor, when a doctor does not know what condition a patient might have, Dr. Fox is the one who gets called by other doctors and nurses "when nobody knows exactly what's going on" because his knowledge base [regarding infectious disease] involves all organ systems. Tr. 8,5-12. This includes figuring out that it might not be an infectious disease (such as BPH). *Id.,* at 8:17-20. (Thus, showing his experience with these issues.) He interacts with urologists and nurse practitioners often in multiple circumstances including in urology clinics with the most common condition being urinary tract infections. *Id,* at 9:14-24. From 2010 to 2015 he had about 3 referrals a week from the urology clinic dealing with clinic triage. *Id.,* 10:6-17. He also works with the antibiotic stewardship program at the University of Wisconsin to make sure that antibiotics are given only in an appropriate and timely fashion. *Id.,* at 12:19-25-13. Thus, Dr. Coogan was hardly the *only* expert with the relevant experience. Finally, Coogan's testimony regarding his relevant experience was sparse at best. Tr. Coogan (morning) 5:18-6:10.

## C. THE EVIDENCE AT TRIAL DID NOT PROVE THAT VARGAS HAD PERSISTANT BPH ISSUES; IN FACT, THE EVIDENCE PROVED THE OTHERWISE

The Defendant continually mis-cites the record to contend that "[a]ccording to the medical records… testimony from Vargas' medical providers, and testimony from Vargas himself, Vargas had suffered from BPH… with lower urinary tract symptoms ("LUTS") since at least 2007." Dkt. 133 at 12. As detailed in the Plaintiff's opening brief there is no medical record that shows that he was suffering

11

from any symptoms after 2007 and before October 2015.  Defendant has not cited to a medical record that shows it and there is a big difference between saying that the records show this and actually being able to provide a quote from the records that prove it – which they have not done because it does not exist.  Similarly, the Defendant also brazenly - and wrongly - contends and misrepresents that Vargas "*himself*" (*id.*) testified to this.   In fact, this is also not true, and at the pages cited to by Defendant, Vargas testified he did not even know what BPH was.[3]

Further, the *actual facts about the medical record,* as testified to by his primary care nurse practitioner, Petrella, was that Vargas did not exhibit any lower urinary tract symptoms.  Thus, she testified in all the times that she saw him, he did not complain about stress incontinence although he was being treated with medication for it.  Tr. Petrella at 13:10-22. She also testified that she did not see any BPH with LUTs entry before October 2015 (when nurse Buesser noted it) and after 2007.  *Id.,* at 17:7-23.  Finally, she again testified that she did not see any documentation after 2007 and before October 2015 for urinary tract infections and that: "[h]e never had any urinary tract symptoms, or if you're leading to infections, with me until the one I diagnosed in June."  *Id.,* 19:2-18.  Thus, both Buesser and Dr. Coogan can speculate and make up a story that the October 15, 2015 symptoms were not new.  It can be repeated by the Defendant *ad nauseum,* but the fact remains that *there is no record of any post 2007 symptoms - period.*  Perhaps if the Defendant quoted from the record where symptoms are documented during the relevant time in the medical record, they would have an argument, but they have not done this.

---

[3]  His precise testimony was: "Q. And BPH, correct? BPH? Do you suffer from BPH? A. What -- what is that?  Q. Benign prostatic hypertrophy? A. I don't know what that it is."  Vargas Tr., 2/16/19 (afternoon) at 102:4-8.  The most that he said was that he was taking medication for it.  He did not testify that he had symptoms. *Id.*

**D. DR. FERNANDEZ'S TESTIMONY WAS NOT CREDIBILE NOR WAS HIS OPINION THAT CO-MORBIDITIES CAUSED THE CTS PROPER OR SUPPORTED**

Regarding the testimony and opinions of Dr. Fernandez, Defendant does not make any substantive argument that his testimony in connection with "pitting" did not require the foundation that it does require. Rather, the Defendant merely states that "even if the Court were to find Vargas' argument that Dr. Fernandez misinterpreted the nursing notes persuasive, it makes no difference in the result reached by the Court." Dkt. 133, 14. That, however, is not true. Further, since it was wrong to permit the testimony, the result leads to further problems with the credibility of Fernandez's opinion and his unsupported opinion regarding the cause of the CTS.

In the first instance, given the timing of the onset of the carpel tunnel symptoms, that is, while Plaintiff was still in the hospital being treated for sepsis and a heart attack, the question is then, what did cause the CTS if it was not the swelling in the hospital? Before trial Plaintiff did make a *Daubert* motion *in limine,* on the issue of the validity of the science upon which Dr. Fernandez was opining that co-morbidities were the cause of the CTS. In denying the motion, the Court indicated in part that Dr. Fernandez did not *"opine"* that CTS was *"caused"* by Vargas' co-morbidities, but rather, he merely stated it was "associated" with different risk factors and that there is a difference between causation and association. Dkt. 71, at 1. The Court then denied the motion to preclude the testimony. Unfortunately, in this case, however, the terms "associated" and "caused" were being used synonymously. In fact, in the Court's Opinion and Order on the trial, this Court stated: "at trial Fernandez presented an alternative *cause* for Vargas' carpel tunnel syndrome: pre-existing chronic illnesses." (Italics added) Dkt. 121 at 28. Plaintiff's motion *in limine* sought to exclude Dr. Fernandez because he "has not relied upon any discernable scientific methodology to opine that Plaintiff's CTS was caused by risk factors and not the swelling he experienced in the hospital." Since the testimony was that risk factors did *cause* the CTS, it was error to permit the opinion without a scientific basis, for which there was none.

13

Equally distressing is that Dr. Fernandez undercut his own opinion on risk factors as opposed to the hospitalization being the cause of the CTS. Dr. Fernandez testified that to hold the opinion that the hospitalization caused the CTS, he testified that there has to be "cause and effect." He further testified that there would "have to be a mechanism in which there was a causation or, at the very least, an aggravation of the carpal tunnel syndrome, and that just didn't exist." Tr. Dr. Fernandez, 56: 21-24. He further testified that "there's not evidence or there's no records that support the diagnosis of carpal tunnel syndrome especially of a severe nature or severe quality around that time [of the hospitalization]." *Id.,* 57, at 13-16. He was further impeached with his deposition testimony wherein he testified that "when you dig down to it, all cases of carpel tunnel syndrome in a sense are caused by swelling if you want to call it that, right? In other words, they're caused by pressure. And how do you define the pressure. Is it from swelling from the outside? Is it swelling from – is it swelling from – swelling from the inside? Is it swelling of the bone, swelling of the tendon? *Id.,* 85:19-86:1.

Thus, applying Dr. Fernandez's own words to the facts of the case shows that the hospitalization more likely than not caused the CTS. In fact, there were records that supported the diagnosis for CTS around the time of the hospitalization, because within 2 weeks of it Vargas was being seen by doctors whose examination led to the diagnosis of CTS. Further, swelling, according to the deposition testimony with which he was impeached, is at the root of all causes of CTS. Finally, the "cause and effect" or the mechanism for it was the swelling that Vargas had in the hospital – which Dr. Fernandez had to admit to in light of the nursing notes that he did not account for in his expert report and to which he, because he lacked the proper foundation, misinterpreted. His error in discounting the swelling testified to by Nurse Nehls, was exacerbated by his admission that his expert report was wrong when it stated that there was no evidence of swelling in the hospital. *Id.,* at 78:14-20. Thus, the combination of his misinterpretation of the nursing "pitting" records coupled with his own testimony about how CTS

14

occurs and the lack of any basis for his opinion that co-morbidities *caused* the CTS result in discounting any credibility in Fernandez's opinion.

### IV.     CONCLUSION

For all the foregoing reasons, Plaintiff respectfully submits that this motion should be granted.


s/Edward M. Fox


ED FOX & ASSOCIATES, LTD.
300 W Adams St, Ste 330
Chicago, IL 60606
(312) 345-8877
efox@efoxlaw.com