**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOUIS VARGAS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:16-CV-11012 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. Background

This is a medical-malpractice case against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*. In October 2015, Louis Vargas visited the Urology Clinic at the Edward Hines, Jr. Hospital, which is run by the Department of Veterans Affairs. He alleges that the Clinic missed a urinary tract infection, which he believes later caused a ten-day hospitalization in November 2015. During those ten days, Vargas's treatment purportedly caused swelling that led to carpal tunnel syndrome.

This Court held a bench trial during which both fact and expert witnesses testified. Following the trial, the Court found that Vargas had failed to satisfy his burden to prove that the health-care providers fell short of the standard of care. The Court credited the testimony of the government's urology expert, Dr. Christopher Coogan. Unlike Vargas's experts, Dr. Coogan is a urologist, and he credibly opined that the

standard of care did not require the health-care providers to conduct follow-up treatment and testing after the October 2015 urinalysis. The Court also found that Vargas failed to prove, by a preponderance of the evidence, that the November 2015 hospitalization caused Vargas to suffer carpel tunnel syndrome. In reaching that decision, the Court credited the testimony of another government expert, orthopedic surgeon Dr. John Fernandez, who credibly testified that during that time Vargas was hospitalized, he did not exhibit the degree of swelling that would cause carpal tunnel syndrome.

Vargas now moves for a new trial and to vacate the judgment. Fed. R. Civ. P. 52(a)(5)(6) and (b); and 59(e). For the reasons explained below, the motion is denied.

## II. Standard of Review

A Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). A similar standard governs a motion to alter or amend factual findings. *Id.* "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). But even though the trial court does have the general authority to assess credibility, the new-trial standard is tough to satisfy, because generally "the district court is bound to the same evidence … considered, and can strike a piece of evidence from its weighing process only if reasonable persons

2

could not believe it because it contradicts indisputable physical facts or laws." *Id.* at 633 (quotation omitted).

### III. Analysis

### A. Timeliness

Vargas mounts a wholesale challenge to the testimony of Dr. Christopher Coogan, the expert urologist who was retained by the government. But Vargas did not meet the pre-trial deadline for challenging the entirety of Dr. Coogan's testimony. On October 11, 2018, the Court set the pretrial-motions and bench-trial schedule. R. 57.[1] The trial itself was set for January 28, 2019. *Id.* On pretrial motions, the Court set November 13, 2018, as the deadline to file "*Daubert*-related"[2] motions; other motions in limine were set to be due by November 26, 2018. *Id.* This staggered schedule, dividing expert-related motions from other motions in limine, was intentionally set to allow more time to deliberate and possibly hold an in-court hearing on it if needed. Indeed, at the status hearing held on October 11, 2018, the Court's notes reflect that the Court asked whether either side planned on trying to knock out the other side's experts. (Neither side appears to have ordered the transcript of that hearing.) Vargas's counsel announced that the Plaintiff did have an objection to one of the government's experts.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]In the following minute entry, the Court referred to these as "expert-motions briefing." R. 58.

A couple of weeks later, after conferral with the parties, the trial date was moved to February 4, 2019, but the Court ordered that the "expert-motions briefing remains as previously scheduled." R. 58. Before the expert-motions deadline, Vargas did file a motion to exclude one of the government's witnesses—but the motion challenged Dr. John Fernandez (the orthopedic surgeon), R. 59, *not* Dr. Coogan.

It was not until the pre-trial conference on January 22, 2019 (more than two months after the expert-motions deadline) that Vargas asserted that Dr. Coogan could not testify at all because he was a urologist and thus supposedly could not opine on the reasonableness of a nurse practitioner's care. *See* R. 71, Order Pretrial Conf. at 1. The Court noted that this argument missed the deadline to exclude challenges to expert opinions. *Id.* at 8. But the Court nonetheless permitted Vargas to brief the issue and argue that Dr. Coogan's testimony should be discounted on that ground. *Id.* at 1-2; *see* R. 74, 78. On the first day of trial, the Court again advised the parties that Dr. Coogan would testify because the motions deadline to exclude experts had passed. R. 131, Trial Tr. 3:12-19 (morning session).

To explain missing the deadline, Vargas lays out a rather convoluted, multi-step argument. First, Vargas contends that the deadline was for *Daubert* objections, which Vargas characterizes as only those objections that challenge an expert's testimony as "junk science." R. 123 Pl. Mot. New Trial at 3-4. Building on that premise, Vargas characterizes his objection to Dr. Coogan as something other than junk science, namely, that Dr. Coogan cannot testify on the standard of care for an area of

4

medical practice in which he is not licensed. In turn, that argument is based on Illinois state law, which still applies the well-known (and time-worn) *Frye* test,[3] which is the state-law counterpart to *Daubert*. *Id.* at 4. To Vargas's way of thinking, the *Frye* argument is different from *Daubert*, so Vargas did not miss the *Daubert*-based deadline. *Id.*

The twists and turns in this argument falter at the first step: the experts-motion deadline was not somehow confined only to motions that sought to make a "junk science" argument. *Daubert* was a broad-ranging opinion that broadly held that Federal Rule of Evidence 702 displaced the *Frye* test. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993). The Supreme Court emphasized the district court's gatekeeping role as to expert testimony, and point-by-point explained "general observations" on how to make the "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly *can be applied* to the facts in issue." *Id.* at 592-593 (emphasis added). So even Vargas's specific argument—that Dr. Coogan's area of expertise could not be *applied* to nurse-practitioner care—was one of the subjects of *Daubert*. Put another way, it was obvious that the Court set the pretrial motions deadline for any Rule 702 motions to exclude an expert's opinion. (This is even plainer given that the Court orally asked, at the October 11, 2018 status hearing, whether

---

[3]The *Frye* test states that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community. *See Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)

either side planned on trying to knock out the other side's experts.) Indeed, when the Court later reminded the parties that the deadline would remain the same, the Court wrote that the "expert-motions briefing" remained as previously ordered. R. 58. Vargas could not reasonably think that the expert-motions deadline did not apply to the effort to exclude Dr. Coogan's testimony. Having missed the deadline, the objection was to exclude Dr. Coogan's testimony in its entirety was untimely made and thus forfeited.

## B. Standard of Care

Even if the objection to Dr. Coogan's testimony had been timely made, it fails on the merits. Vargas argues that Illinois state law bars an expert from testifying as to the medical standard of care that is outside the expert's specific school of medicine. Pl. Mot. New Trial at 6. And because Dr. Coogan is not licensed as a nurse practitioner, Vargas says, the doctor was not qualified to opine on whether a nurse practitioner ought to have followed-up further on Vargas' urinalysis in October 2015.

Under Illinois law, generally speaking a "health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify ... [and] the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community." *Sullivan v. Edward Hosp.,* 806 N.E.2d 645, 655 (Ill. 2004). But there is an important exception to the license requirement, namely, a case in which "the allegations of negligence do not concern an area of medicine about which

there would be a different standard between [a] physician and another school of medicine." *Wingo by Wingo v. Rockford Mem'l Hosp.,* 686 N.E.2d 722, 729 (Ill. App. Ct. 1997); *see also Williams v. Mary Diane Schwarz, P.A.,* 2018 WL 2463391, at *7 (N.D. Ill. June 1, 2018) (declining to bar physician's testimony on standard of care applicable to physician's assistant, reasoning that "[t]here has been no suggestion that physician assistants are held to a different standard of care than medical doctors with regard to the treatment at issue."). For example, Illinois courts have allowed testimony by physicians on what a nurse was required to communicate to a physician between a patient's visits, *Wingo*, 686 N.E.2d at 729, or a nurse's obligations within a close-knit surgical team. *Petryshyn v. Slotky*, 902 N.E.2d 709, 716 (Ill. App. Ct. 2008).[4]

Here, there is no reason to believe that Dr. Coogan was testifying as to a standard of care that applies differently between physicians and nurse practitioners. As a urologist, Dr. Coogan was qualified to testify (and credibly did so) on the standard of care required in identifying, diagnosing, and treating urinary tract infections. There is no persuasive record evidence that drives a distinction between how a urologist and a nurse practitioner would approach identifying potential urinary tract infections. In

---

[4]It is worth pausing for a moment here to note that neither side explicitly addressed whether this Illinois evidentiary doctrine applies in federal court. Typically, even in diversity and FTCA cases, Rule 702 and federal evidence law governs, rather than state law. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017); *Carter v. United States*, 333 F.3d 791, 794 (7th Cir. 2003) (rejecting argument that a Maryland procedural rule would supersede federal procedural rules in FTCA action applying substantive Maryland law). It is unclear whether this particular Illinois doctrine is considered procedural or substantive, *see Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010), but the Court need not decide the issue given the parties' implicit agreement that it does apply in federal court.

fact, Vargas's own infectious-disease expert, Dr. Barry Fox, drew the same equivalence between the two types of health-care practitioners: Dr. Fox testified that he "would hope that the nurse practitioners would follow the same general expertise of medical care" as a physician who treats infectious diseases. R. 129, Trial Tr. at 23:13-16.

The specific practices at the Hines VA point to the same conclusion. Nurse Practitioner Buesser testified that, during her first six months on the job, her test orders and prescriptions needed to be co-signed by either an attending urologist, resident, or longer-tenured nurse practitioner. R. 111, Trial Tr. Buesser at 6:12-7:8. Dr. Marc Nelson, who was a resident at the time, co-signed Buesser's order for Vargas in October 2015. R. 97, Trial. Tr. at 9:4-15. The fact that Buesser required co-signers for her orders, and that those co-signers included physicians and not just nurses, shows that she—and her co-signers—applied the same standard of care. Dr. Lisa Bresler, a urologist at Hines VA, also testified that urology patients were not assigned to a specific health-care provider but would see the first available provider—whether that be a resident, nurse practitioner, or a physician. R. 110, Trial. Tr. at 5:24-6:16. This unrebutted testimony corroborates that there is no difference between what a nurse practitioner and a urologist ought to do in detecting a urinary tract infection. For these reasons, there was no manifest error of law to allow Dr. Coogan to testify as to the standard of care.[5]

---

[5]One final point is worth making here. The underlying rationale animating the license requirement is to "prevent a *higher* standard of care being imposed on the defendant." *Wingo*, 686 N.E.2d at 729 (emphasis added). In other words, Illinois common law has established this general principle in order to prevent an expert from imposing too demanding a standard

### C. Factual Findings

### 1. Weight of Dr. Coogan's Testimony

Vargas also challenges certain factual findings. To start, Vargas argues that the weight of evidence disfavored crediting Dr. Coogan as more qualified than Dr. Fox or Nurse Practitioner Petrella when testifying on the standard of care. Pl. Mot. New Trial at 9-10. Vargas points to Petrella's experience as a primary care provider, which includes diagnosing and ordering tests. *Id.* at 10. With regard to Dr. Fox, Vargas highlights Dr. Fox's "extensive" work with infectious disease, his work with urologists and nurse practitioners, and his writings on urinary tract infections. *Id.* Neither of these points justify a new trial. First, Petrella was not offered as an expert witness on the standard of care. She was a fact witness. Second, Dr. Fox's work *with* urologists does not vest him with superior expertise over an *actual* urologist, which Dr. Coogan was. *See* R. 121, Opinion at 22. There was no error in crediting Dr. Coogan's testimony.

### 2. BPH

Next, Vargas moves to alter the Court's finding that Vargas had prior ongoing issues with benign prostatic hyperplasia (referred to as BPH), that is, an enlarged prostate. He points to the absence of BPH symptoms in any medical record between 2007–2015. Pl. Mot. New Trial at 10. He also argues that a change in his medication in October 2015 shows that he had an onset of *new* symptoms rather than ongoing

---

of care on a medical practitioner by foisting a more demanding standard of care governing another area of medicine. If anything, then, urologists—who are specialists in diagnosing urinary tract infections—would apply a *higher* standard of care than nurse practitioners.

symptoms. *Id.* 10-11. But the Court already considered trial testimony that rebutted these arguments. First, Nurse Practitioners Buesser and Petrella attributed the gap in medical records to Vargas's use of outside providers other than Hines VA during that period. *See* Opinion at 10-11. What medical records did show is that Vargas remained on Terazosin and Oxybutynin to treat BPH-related symptoms throughout that same period. *Id.* at 10. Buesser also testified to Vargas's *ongoing* symptoms based on medical records and her conversation with him. *Id.* at 7. Lastly, Buesser credibly testified that she switched Vargas from Terazosin to Tamsulosin because it was a newer version of the *same* drug, not because he was exhibiting new symptoms. *Id.* at 8. The circumstantial evidence justified a finding that Vargas did have an on-going BPH condition.

### 3. June 2015 Diagnosis

Vargas also argues that the Court should have rejected Dr. Coogan's opinion that Vargas did not have a urinary tract infection in June 2015 despite Nurse Practitioner Petrella's diagnosis that Vargas did suffer from an infection. Pl. Mot. New Trial at 11. Vargas also points to testimony from Dr. Fox and Nurse Practitioner April Turner, who stated that a 100,000 bacteria colony per unit count would have constituted a urinary tract infection. *Id.* Lastly, Vargas points to the fact that providers found the "same bug" in June 2015 as in November 2015. *Id.*

First, the Court's factual findings made only passing reference to Dr. Coogan's opinion that Vargas did not have a urinary tract infection as of June 2015. *See* Opin-

ion at 23. The Court's decision on the government's non-liability does not rely materially on this fact. Presumably, Vargas's argument is as follows: if he had a UTI in June 2015, then his providers should have undergone the same procedures (including a urine culture) in November 2015 when his urinalysis returned similar results. But there is no dispute that Nurse Practitioner Petrella *did* diagnose him with a urinary tract infection in June 2015. *Id.* at 5-6. Dr. Coogan's competing opinion at trial has no bearing on the fact that Vargas's treaters at the Hines VA would have been aware of that diagnosis at the time of the October 2015 hospitalization. Ultimately, it is not all that important whether Petrella actually made a correct diagnosis in June 2015. The question is whether the follow-up treatment Vargas received in June 2015 was *required* by the standard of care. On this question, the Court credited the testimony of Dr. Coogan who credibly opined (based on all the reasons discussed in the original Opinion) that, while Petrella's follow-up procedures after June 2015 of course satisfied the standard of care, they were not *required*. *Id.* at 23.

### 4. Pitted versus Non-pitted

Next, Vargas contends that the Court erred in crediting the testimony of Dr. Fernandez, who opined on the significance of "pitted" versus "non-pitted" swelling. Pl. Mot. New Trial. at 12. At trial, Fernandez testified on his interpretation of nursing notes that charted Vargas's swelling in the hospital. *See* Opinion at 27. Dr. Fernandez concluded that medical records did not show swelling severe enough to cause carpal tunnel syndrome. R. 101, Trial. Tr. 56:16-57:22. Dr. Fernandez also explained what

11

the medical records mean when they note certain swelling as "non-pitting". *Id.* at 59:9-62:2. He testified that "non-pitting" refers to *mild* swelling. *Id.* at 61:18.

Vargas now contends for the first time that, based on a "quick Google search," "pitting" really refers to the *cause* of swelling and not to its severity. Pl. Mot. New Trial at 12. Vargas further contends that that the "1's" scored next to non-pitting swelling were incorrect because non-pitting swelling should not have been scored at all. *Id.* at 13.

These arguments fail. First, nothing stopped Vargas from presenting this evidence (if it can be called that) during the trial. So he forfeited this factual contention. Second, a "quick Google search" is not admissible evidence. Third, even if the fruits of the Google search could be considered as evidence, the Court would not credit that evidence over the expert testimony of Dr. Fernandez. Fourth, Vargas does not otherwise explain the relevance of this new revelation. The issue is not what caused the swelling; it is whether the swelling caused carpal tunnel syndrome. Perhaps the inference is that non-pitted swelling can be severe, contrary to Dr. Fernandez' testimony. But this is undermined by Vargas' second contention, which evidently is that non-pitting swelling should not have even been scored *at all* on the 1-4 scale. Pl. Mot. New Trial at 13. Fifth and finally, Vargas does not explain why there is a numbering system at all as to a *cause* of swelling. Vargas does not, for example, offer some kind of numerical-coding system for causes of swelling as distinct from severity of swelling. Nothing about this contention warrants a new trial.

12

### 5. Chronological Sequence

Lastly, Vargas argues that the Court failed to consider certain events that, when placed in a chronological sequence, would suggest that the November 2015 hospitalization caused carpal tunnel syndrome. Pl. Mot. New Trial at 13-14. (This argument goes only to damages, rather than liability.) Vargas recites this chronology as follows:

- Vargas repeatedly complained of hand weakness during the November 2015 visit.

- On November 17, a discharge note read "no acute complaints beyond recurrence of hand stiffness to both hands after having IV fluids on 11/16/15."

- On December 4, the Neuroscience Institute made a referral in which Lou complained of hand pain.

  On December 9, Vargas complained of carpal-tunnel-syndrome-related hand pain during a visit with Nurse Practitioner Petrella.

- On December 14, during a visit at the Neuroscience center, Vargas was noted as having "associated swelling in the hand."

- On January 6, 2016, Vargas had a nerve conduction study, which indicated carpal tunnel syndrome.

*Id.* 13-14. Given that all of this occurred within six weeks of being hospitalized for UTI, Vargas contends that there is only a "random chance" that co-morbidities caused his CTS. Pl. Mot. New Trial at 14.

Nothing about this timeline undermines the Court's factual findings, and the Court already considered the events on the timeline. For example, the Court found that Vargas experienced ongoing hand pain beginning in November 2015. *See* Opinion at 11-16. The Court also acknowledged that nurse's notes reflected *some* swelling

13

in his hands during his November 2015 hospitalization. *See id.* at 13. The Court also found that nerve-conduction studies showed the presence of carpal tunnel. *Id.* at 14. But this circumstantial evidence does not manifestly outweigh what the Court primarily relied on in finding a lack of causation: Dr. Fernandez' opinion that the degree of swelling needed to cause carpal tunnel syndrome simply was not reflected in the medical records of the hospitalization. *Id.* at 27. The finding that Vargas failed to prove causation by a preponderance of the evidence remains intact.

### IV. Conclusion

Vargas's motion for a new trial or to alter the judgment is denied. The tracking status hearing of December 4, 2020, is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 24, 2020